**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-067 (DLF)** |
| **JOSEPH BRODY** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Brody to 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a $200 special assessment. A 30-month term of incarceration is at the high end of the 24 to 30–month recommended Sentencing Guidelines range, as calculated by the government.

## I.    INTRODUCTION

The defendant, Joseph Brody, age 24, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Brody, wearing a grey business suit and tie, breached the U.S. Capitol on January 6 with four companions (all from the America First group) approximately three minutes after the first breach of the building.

Throughout their participation in the riot, Brody was the most aggressive of the small group of five people he traveled to the Capitol with on January 6. While he and his group spent nearly 35 minutes inside the Capitol, including venturing into Speaker Nancy Pelosi's personal office, Brody was the only one of the five to walk onto the Senate Floor. There, he took pictures of the inside of a Senator's private desk. After finally leaving the Capitol building, Brody proceeded to assault a police officer who was guarding an entrance to the Capitol by grabbing a bike rack fence and shoving it into the officer. Brody then walked to a media station where he participated in destroying media equipment owned by private companies, including ripping out a corded telephone.

The government recommends that the Court sentence Brody to 30 months of incarceration for his convictions under 18 U.S.C. §§ 231(a)(3) and 111(a). A 30-month sentence reflects the gravity of Brody's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Doc. 79, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Brody's Role in the January 6, 2021 Attack on the Capitol**

On January 6, 2021, Brody joined four of his friends and acquaintances—Jon Lizak, Paul Lovley, Thomas Carey, and Gabriel Chase—to attend former President Donald Trump's Stop the Steal rally at the Ellipse in Washington D.C.[2] The group of five first met through their mutual interest and involvement in the political organization America First, a movement led by Nick Fuentes, who hosts a nightly show called "America First" and "sees America's 'white demographic core' as central to its identity."[3] For years before January 6, Brody used internet platforms like Discord, Twitter, and Telegram to communicate with other America First members. He also attended rallies and other in-person events. There, he met Lizak and Chase, two of the individuals he would later travel to the Capitol with on January 6. Numerous other members of the America First movement were also present for, and participated in, the events of January 6.

The group of five coordinated their attendance at the rally and met there on the morning of January 6. Brody knew that the certification of the 2020 Presidential electoral vote was occurring at the Capitol building, and after the rally, the group of five marched toward the U.S. Capitol together. *See* Image 1.

---

[2] Lizak, Lovley, Carey, and Chase have each pleaded guilty and been sentenced for their role in the riot on January 6, 2021. *See United States v. Thomas Carey*, 22-CR-375 (CKK); *United States v. Gabriel Chase*, 23-CR-018 (CKK); U*nited States v. Paul Lovley*, 23-CR-019 (CKK); and U*nited States v. Jon Lizak*, 23-CR-163 (CKK).

[3] The Southern Poverty Law Center, *Nick Fuentes*, https://www.splcenter.org/fighting-hate/extremist-files/individual/nick-fuentes, (last visited June 10, 2024.)



*Image 1: Brody (circled in yellow) marching with others from the Stop the Steal rally to the Capitol on January 6.*

Brody and his group entered the Capitol building through the Senate Wing Door at approximately 2:16 p.m., just three minutes after the first breach of the building through the same entrance. *See* Image 2. They did so while a piercing alarm was blaring. Shortly thereafter, members of the Senate and the House of Representatives were forced to evacuate the Capitol.



*Image 2: Brody (circled in yellow), standing inside the Capitol with Lizak, Lovley, Carey, and Chase approximately 3 minutes after the first breach.*

4

The group then proceeded toward the Crypt with a number of other rioters where a few severely outmanned Capitol police officers attempted to stop the progress of the swelling mob. After a few minutes, the crowd overwhelmed the officers in the Crypt and advanced further into the building. The crowd, including Brody, moved into a room containing busts of historical figures, known as the "Corridor of Honorary Citizens," then down a hallway near several offices.

Brody and his group reentered the Crypt and entered a room containing a spiral stairwell, then ascended the stairwell. At the top of the stairwell, the group continued forward and entered a small atrium that displayed a plaque reading, "Speaker of the House Nancy Pelosi." Brody and his group then walked into a conference room within Speaker Pelosi's office suite. *See* Images 3 and 4. As Brody and the rest of the "pro-Trump mob beat down the door to … Pelosi's office …her staff ran into a conference room, barricaded the door, switched off the lights and cowered under a long table." https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/





*Images 3 and 4: Screenshots from Sentencing Exhibit 1 show the doorway to the Office of the Speaker that Brody entered (at 0:00), and Brody (circled in yellow), with Lizak, Lovley, Carey, and Chase inside the office (at 0:02).*

The group then left Speaker Pelosi's office and entered the Rotunda, where they loitered for several minutes. At approximately 2:42 p.m., after departing the area of the Rotunda, the group marched together and ascended the House Gallery Stairs to the third level of the Capitol, where they proceeded through the Senate East Corridor. The group proceeded to the Senate Chamber and stopped outside of the doors labeled as Secretary of the Senate's Office and the Senate Gallery Door Number 1.

Brody broke off from his group of fellow rioters and entered the Senate Chamber. None of the other members of Brody's party entered the Senate Chamber. While in the Chamber, Brody held a cell phone in his hand and appeared to photograph or record the interior of the Senate Chamber, including documents and other information on top of and inside several senators' desks. *See* Image 5. While he was in the Senate Chamber, Brody spoke on his cell phone to Chase, one of the members of the group of five he entered with.



*Image 5: Screenshot from Sentencing Exhibit 2 showing Brody (circled in yellow), on the floor of the Senate Chamber, photographing of the contents of a Senator's desk (at 0:34).*

Finally, at approximately 2:50 p.m., Brody's group began to exit the Capitol, one at a time, through the Senate Carriage Door. Brody was the last member of his group to leave the building.

Eventually, the group moved to the north side of the Capitol, outside the building. There, police officers including U.S. Capitol Police Officer H.H. were attempting to keep rioters from breaching the Capitol's North Door. While Officer H.H. attempted to use a fire extinguisher to keep the rioters at bay, Brody grabbed a metal bicycle rack, lifted it up, and shoved it up and over a concrete barrier and into Officer H.H. The force knocked the officer backward. *See* Image 6. Of the five members of his group, only Brody engaged in assaultive conduct.



*Image 6: Screenshot from Sentencing Exhibit 3 showing Brody (yellow arrow), pushing the bike rack into the officer (at 0:02).*

In one dramatic image, Brody can be seen climbing atop the stairs and posing, arms outstretched and facing the crowd, while smoky gas filled the air around him. *See* Image 7.



*Image 7: Brody looks out on the crowd from the stairs in front of the North Door.*

Brody and his group then moved to an area outside the Capitol building where news media organizations had set up broadcasting equipment. Although metal barricades had been erected around the equipment, rioters had breached the barricades and begun destroying and looting the media equipment. Brody and his group took some items from the pile of equipment. Brody ripped out a corded phone, then tried to pull out an orange extension cord before throwing it down and walking away. *See* Image 8.



*Image 8: Screenshot from Sentencing Exhibit 4 showing Brody (circled in yellow), tearing a corded telephone out of the media area (at 0:05).*

Until his post-plea interview with the government, Brody had had not expressed remorse for his actions on January 6, 2021. He declined to be interviewed about the events of January 6 following his arrest, and he expressed no remorse to the Probation Officer during his presentence interview. Even when he interviewed with the government, although Brody claimed to feel remorse, he minimized his conduct on January 6 and did not express acceptance for his actions. He blamed others for what happened on January 6, saying he was caught up in a crowd and only following others. That description is at odds with what the evidence shows took place on January 6: Brody acted more egregiously than the four people he traveled with, and more violently than

many people around him.

## THE CHARGES AND PLEA AGREEMENT

On February 6, 2024, Brody was charged by Information with two counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One), and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two). On February 21, 2024, Brody was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## III.    STATUTORY PENALTIES

Brody now faces sentencing on Counts One and Two. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Brody faces the following punishment: for Count One, up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100; and for Count Two, up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

With one exception, the government's analysis is the same as the PSR's analysis of the Sentencing Guidelines. PSR ¶¶ 38-57. The PSR does not include a Guidelines analysis for both Counts—Counts One and Two—to which Brody pleaded guilty. *See* PSR ¶¶ 43-57. [4] That Guidelines analysis follows:

---

[4] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

<u>Count Two: 18 U.S.C. § 111(a)(1)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

| | | |
|---|---|---|
| **Combined Offense Level** | | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* Plea Agreement at ¶¶ 5(A).[7]

---

Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 47) that Counts One and Two group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[7] The revised PSR also includes a dangerous weapon enhancement under U.S.S.G. § 2A2.2(b)(2)(B) in the offense level calculation for Count Two because Brody used a metal barricade to assault the victim-police officer. *See* PSR ¶¶ 49, 110. Consistent with the plea agreement, the government is not asking the Court to apply this enhancement.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As the parties agreed in the plea agreement, (*see* Doc. 78 at 4), § 4C1.1 does not apply in this case because Brody used violence or credible threats of violence in connection with the offense as described in USSG § 4C1.1(a)(3). In particular, Brody used a metal bike rack to assault Officer H.H. The PSR agrees: "Pursuant to U.S.S.G. §4C1.1(a)(3), Brody is not eligible for the Zero-Point Offender adjustment." PSR at ¶ 56.

The U.S. Probation Office calculated Brody's criminal history as category I, which is not disputed. PSR ¶ 60. Accordingly, based on the government's calculation of Brody's total adjusted offense level, after acceptance of responsibility, at 17, Brody's Guidelines imprisonment range is 24 to 30 months of imprisonment. Brody's plea agreement contains the same Guidelines range.

## V.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Brody's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Even in a sea of criminal activity on January 6, Brody's conduct stands out as particularly reprehensible. At each point in his day, Brody was the most aggressive of the five people he was

12

with and acted more aggressively than the other rioters around him. Brody was not satisfied to merely breach the threshold of the U.S. Capitol building, he had to go a step further and enter onto to the floor of the Senate Chamber. That room is the very heart of the Capitol, one of the most sensitive spaces in the building, and the precise location where the Vice President and Senators would have been debating the certification—but for rioters like Brody. There, moreover, he went so far as to poke around in obviously private desks. He also breached the Speaker's Office Suite, a private, sensitive space, while members of her staff hid nearby. Once Brody left the building, he was not done—he thrust a bike rack fence against a police officer in an aggressive attack. Brody then went further still, destroying equipment belonging to the media.

Brody's participation in the breach of the Capitol with a group—a cohort from America First—is also aggravating. Brody coordinated his attendance at January 6 with the other members of his group, and they coordinated their actions once they were inside the Capitol—including while Brody was on the floor of the Senate chamber. As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961).

The nature and circumstances of Brody's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months. Brody both committed a violent assault and brazenly breached the most sensitive spaces of the Capitol, showing total disregard for the legitimate working of democracy that day. That combination of assaultive and obstructive behavior warrants a high-end sentence.

### B.  Brody's History and Characteristics

As set forth in the PSR, Brody has no criminal history. PSR ¶¶ 58-64. The parties agree

Brody has zero criminal history points and is in Criminal History Category I.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration. Brody's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out

of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

weighs heavily in favor of a lengthy term of incarceration.

First, although Brody has a criminal history category of I, his aggressive activity on January

6 shows a proclivity for assaultive behavior. Second, Brody has minimized his conduct and not

expressed a full acceptance for the actions he took that day. His actions and words demonstrate

that this defendant's sentence must be sufficient to provide specific deterrence from committing

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

future crimes of violence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most comparable case to have come before this Court is *United States v. Kevin Creek*, 21-CR-645 (DLF). Creek pushed through a barrier, ran through the front of the crowd on the Capitol's West Plaza, grabbed a police officer and drove him backward forcefully several feet, then hit him in the face shield of his helmet. Creek then gave another officer a shove in the shoulders and kicked him, causing the officer to fall to the ground. Creek pleaded guilty to a violation of 18 U.S.C. § 111(a), the same count that drives the Sentencing Guidelines calculation here. This Court sentenced Creek to 27 months of incarceration, the middle of the applicable 24 to 30-month Sentencing Guidelines range. While Creek's assaultive conduct may have been more violent than Brody's, Creek did not enter the Capitol building, let alone breach the Speaker's Office, terrorizing her staffers, and the Senate Chamber as Brody did, making the 30-month sentence appropriate here.

Another comparable assault of police officers occurred in *United States v. Landon Copeland*, 21-CR-570 (APM), where the defendant fought with officers on the West Plaza. Like Brody, Copeland used a bike rack barricade to assault police officers, in that case by charging at the police with the fence and thrusting it at them. Copeland, however, did not enter the Capitol building, the Speaker's office, or the Senate floor, as did Brody. Following Copeland's plea to § 111(a) (including a dangerous weapon enhancement the government is not seeking in this case), Judge Mehta sentenced him to 36 months of incarceration.

---

in this case would not result in an unwarranted sentencing disparity.

*United States v. Kevin Galetto,* 21-CR-517 (CKK) presents another comparable case. Galetto went to the West Front of the Capitol building and was one of the first rioters to enter and advance against the police line inside the tunnel. He pushed against an officer and tried to take his riot shield, then left the tunnel. He later re-entered the tunnel around joined a push against officers who were attempting to hold the tunnel. Galetto pleaded guilty to violations of 18 U.S.C. §§ 231(a)(3) and 111(a)(1), the same charges Brody faces. Judge Kollar-Kotelly agreed with the government's sentencing recommendation in that case and sentenced Galetto to 27 months of imprisonment. In particular, she cited the defendant's decision to re-enter the tunnel an hour and a half after being pushed out the first time, a fact that parallels Brody's repeated instances of bad conduct on January 6 (first entering the Speaker's office and Senate floor, then assaulting Officer H.H., then destroying media equipment). Judge Kollar-Kotelly also found Galetto's calling out for more people to enter the tunnel to be an aggravating factor; Brody, too, acted more egregiously that the other people around him. Galetto, unlike Brody, did not enter the Capitol building, the Speaker's office, or the Senate chamber, so the 30-month sentence is appropriate here.

## VI.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11] Generally, restitution under the VWPA must "be tied to the loss

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer H.H., did not suffer bodily injury as a result of Brody's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Brody must pay $2,000 in restitution, which reflects in part the role Brody played in the riot on January 6.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Brody's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 128.

Because Brody engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims'

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Brody responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Brody to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Brody's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Brody was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a $200 special assessment. A 30-month term of incarceration is at the high end of the 24 to 30–month recommended Sentencing Guidelines range, as calculated by the government.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      */s/ Eric W. Boylan*
Eric W. Boylan
Assistant United States Attorney
Texas Bar No. 24105519
Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov
601 D Street NW
Washington, D.C. 20001