## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JOSEPH BRODY,

               Defendant.

Crim. Action No. 24-cr-67 (DLF)

## JOSEPH BRODY'S MEMORANDUM IN AID OF SENTENCING

*Good decisions come from experience.*

*Experience comes from making bad decisions.*

*-   Mark Twain*

Mr. Brody is, at his core, a hardworking person whose young age and the surrounding mob frenzy contributed to his actions on that day. He has admitted that he impeded officers on January 6. He has reflected on and is ashamed of his conduct, and he accepts his punishment for what he did. However, counsel submits that Mr. Brody's youth—he was just 21 years old during the events of January 6—militates in favor of a sentence that does not include a period of incarceration. For the reasons that follow, a sentence of home incarceration followed by probation is sufficient, but not greater than necessary, to achieve the goals of sentencing and account for the factors in § 3553(a).

## I.     Background

Mr. Brody was arrested on September 14, 2022.  He was ordered released with strict conditions of release following oral motions by the parties on September 15, 2022. Mr. Brody has been fully compliant with strict measures of supervision for almost two years now. Mr. Brody accepts responsibility for his conduct and is prepared to accept the consequences of his actions in order to resume his positive path.  Accordingly, on January 30, 2024, he accepted responsibility by pleading guilty to one count of 18 U.S.C. § 231(a)(3) and one count of 18 U.S.C. § 111(a)(1).

Counsel has reviewed the Pre-Sentence Report (PSR) and offers no objection. Regardless of the guideline range this Court finds, counsel respectfully submits that a sentence of home incarceration followed by probation is sufficient, but not greater than necessary, to achieve the goals of sentencing, especially given the collateral consequences of a felony conviction for this young man with no criminal record.

## II.    Legal Standard

When imposing a sentence, the Court must consider several factors, including: (1) the United States Sentencing Guidelines and related Sentencing Commission policy statements; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes, and to provide the defendant with needed correctional treatment; (5) the kinds of sentences available; and (6) the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a); *United States v. Booker*,

2

543 U.S. 220, 259 (2005). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions. *See* 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an

individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348-50 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

## III.   Imposing a Sentence of Home Incarceration Followed by Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18 U.S.C. § 3553(a).

### A. Mr. Brody's history and characteristics support the requested sentence.

Mr. Brody was born in Springfield, Virginia and is the youngest of his four siblings. He is now 24 years old. Mr. Brody's parents raised him to hold himself accountable and to value "honesty, integrity, and fortitude." He is a valued member of his community and described by all those close to him as reliable and charitable with his time and ability. *See* Exhibit A, Six letters from friends and family.

Embodying these values, Mr. Brody excelled at Robert E. Lee High School, where he wrestled, captained the football team, and captained the national championship rugby team. Mr. Brody also dedicated several hours a week to volunteering at his local church throughout his time in high school. After graduating with a 4.0 GPA, he enrolled at Northern Virginia Community College while also

working part time. Despite successfully completing over half of the credit requirements, he withdrew from the program due to financial strain.

Until only recently, Mr. Brody has maintained steady employment. After graduating from high school, he worked at Chipotle while pursuing his college degree. Then, he worked at Giant as a front-end assistant manager for one year. After that, he worked as a content technician at Paul Davis Restoration for seven months. Most recently, he worked seasonally in overnight receiving at Target.

Mr. Brody has spent his time unemployed caretaking for his sick father. Sadly, Mr. Brody's ailing father passed away the day after Easter just a few short months ago. Mr. Brody's father was a stroke victim who had memory loss, hearing impairment, and required frequent hospitalization. Since the events of this case, most of Mr. Brody's time was spent working and helping care for his father up until his recent passing while continuing to volunteer at his local church. Mr. Brody has remained optimistic about his future and hopes to lead a quiet, stable life in Springfield, Virginia, where he is supported by family. He plans to continue his education in the future by attending trade school and eventually obtaining long-term employment in a high-skill trade field.

     i. ***Mr. Brody's age at the time of the offense supports a downward variance.***

Mr. Brody is a young, hardworking man whose age and immaturity at the time of the offense bears on his culpability because "there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on

average."[1]  Studies on brain development in adolescents by the National Institutes of Health show that the prefrontal cortex, the "executive" part of the brain important for controlling reason, organization, planning, and impulse control,  and the region of the brain that inhibits risky behavior, does not fully form until approximately age 25.[2] Before the brain is fully developed, there is a tumultuous stage of brain development when the limbic system—the areas of the brain responsible for detecting external threats and generating emotions, including the "fight or flight response"—is overstimulated by sex hormones such as testosterone, while the prefrontal cortex—the portion of the brain responsible for impulse control and reasoning—is still immature and undergoing extensive reorganization.[3]  The imbalance and inconsistent coordination between these two areas of the brain, which persists well into the mid-20s, makes young people more prone to risky behavior and less capable of making rational decisions when they are emotionally aroused.[4]

The Supreme Court has found young people "have diminished culpability and greater prospects for reform."  *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *see also Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).  This is because developments in psychology and brain science have shown juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and

---

[1] USSC, Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015 (2017), https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2017/20170525_youthful-offenders.pdf.

[2] *See* Jay N. Giedd, Structural Magnetic Resonance Imaging of the Adolescent Brain, 1021 Annals N.Y. Acad. Science 105-09 (June 2004); Elizabeth Williamson, Brain Immaturity Could Explain Teen Crash Rate, Feb. 1, 2005, at A01.

[3]*See* Laurence Steinberg, Age of Opportunity: Lessons from the New Science of Adolescence 69–72 (2014); Mariam Arain et al., Maturation of the Adolescent Brain, 9 Neuropsychiatric Disease & Treatment 449, 451–55 (2013).

[4] Steinberg, *supra* note 4, at 77.

heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. 567 U.S. at 471 (2012) (quotation marks and citations omitted).

In determining an adequate sentence, this Court should take into account the understanding among experts that the brain of a 21-year-old boy is different from that of the adults this Court more commonly sentences.

**B. The nature and circumstances of the offense support the requested sentence.**

      ***i. Mr. Brody's actions were made in the midst of mob frenzy, which should be considered for sentencing.***

In addition to the consideration of his young age, this Court should also consider that Mr. Brody's conscience and values were overcome by the larger group's emotions. Mr. Brody has always longed for community, seeking it in his high school sports teams and in his church. The same happened here when Mr. Brody joined the crowd at the Capitol. The mob mentality that influenced the crowd on January 6, 2021, does not excuse his actions, but the concept of groupthink and the research discussed should be considered as part of the circumstances of the offense under 18 U.S.C. § 3553(a).

Mr. Brody's actions on January 6 were the result of his choices. However, his "choices" can be directly linked to the idea of "groupthink." In 1970, psychologist Irving Janis coined the phrase "groupthink" to describe "a process in which a group

can make bad or irrational decisions as each member of the group attempts to conform their opinions to what they believe to be the consensus of the group."[5]  Groupthink often occurs when people are deeply involved in a group, sharing a strong feeling of solidarity and determined to maintain the group relationships, no matter the costs. Group members often behave at a maturity level well below what they ordinarily would.  "A man descends several rungs in the ladder of civilization . . . by the mere fact he forms part of an organized crowd. Isolated, he may be a cultivated individual: in a crowd, he is a barbarian - this is, a creature acting by instinct."[6]  Regarding group behaviors, neurologist Sigmund Freud argued that people in groups exhibit a loss of individuality, focus their thoughts and feelings into the common direction, are overcome by the unconscious power of emotion rather than reason and judgment, and are compelled to immediately carry out their intentions and the intentions of the group.[7]

Group violence happens because individuals, whose conscience and values are overcome by the group's emotions, now look to the group leader as their moral compass.[8]  Before the events of January 6, 2021, former President Donald Trump encouraged Americans to travel to Washington, D.C. and attend the "Stop the Steal" rally. At this rally, claims that the 2020 Presidential Election was stolen were repeated and action was encouraged.  Representative Madison Cawthorn announced,

---

[5] Robert Bejesky, The SSCI Investigation of the Iraq War: Part i: A Split Decision, 40 S.U. L. Rev. 1, 28 (2012).

[6] Gustave Le Bon, *The Crowd: A Study of the Popular Mind* 12. (Norman S. Berg ed., 1968)

[7] Ravi Bhavanani, Ethnic Norms and Inter ethnic Violence: Accounting for Mass Participation in the Rwanda Genocide, 43 J. PEACE RES. 6, 653 (2006).

[8] Steve K. Baum, *The Psychology of Genocide: Perpetrators, Bystanders, and Rescuers*, Cambridge Univ. Press, 9, 199 (2008)

"This crowd has some fight in it. ... The Republicans hiding and not fighting, they are trying to silence your voice."[9]   Former President Trump addressed the crowd, saying:

> And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore . . . . So we're going to, we're going to walk down Pennsylvania Avenue . . . . And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country . . . .So let's walk down Pennsylvania Ave.[10]

Social scientists have long observed how individuals in crowds of like-minded people can act in ways they never would individually because the *crowd* lost control.[11]   Often, their conduct cannot be connected to duress, mental illness, emotional upset, or any other mitigating conditions commonly recognized under criminal law; however, many crowd members have "fully internalized the beliefs and values" of the group leaders, influencing their conduct.[12]   With leadership members encouraging people to fight on January 6, mob frenzy took over.

"One of the main factors of the groupthink theory consists of an 'illusion of invulnerability . . . [leading people to] ignore obvious danger, take extreme risk, and [be] overly optimistic.'"[13]   Brian Levin, the director of the Center for the Study of Hate & Extremism at California State University, has found that anyone who is part of the

---

[9] Joseph Choi, *Former sheriff regrets supporting Madison Cawthorn after he 'inflamed' Capitol mob*, The Hill, Jan. 12, 2021

[10] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot.

[11] Associated Press, *Rioters blame 'mob mentality' for violence at the Capitol*, American Journal News, May 24, 2021, https://americanjournalnews.com/january-6-capitol-rioters-mob-mentality-defense/.

[12] Paul H. Robinson & Lindsay Holcomb, *Indoctrination & Social Influence as a Defense to Crime: Are We Responsible for Who We Are?*, Penn Carey Law: Legal Scholarship Repository (2021), https://scholarship.law.upenn.edu/faculty_scholarship/2153?utm_source=scholarship.law.upenn.edu%2Ffaculty_scholarship%2F2153&utm_medium=PDF&utm_campaign=PDFCoverPages.

[13] Kelley Tiffany, *Cheering Speech at State University Athletic Events: How Do You Regulate Bad Spectator Sportsmanship?*, 14 Sports Law. J. 111, 136 (2007) (quoting I.L. Janis & L. Mann, Decision Making: A Psychological Analysis of Conflict, Choice, and Commitment (1997)).

group, no matter how weak their connection, can turn violent because the responsibility seems to spread among the group and a "cloak of anonymity" covers the whole.[14]

Research on the mob mentality of sporting fans supports the idea that a cultivated individual can become so entrenched in the group's goals that he no longer makes the same decisions he would on his own. The mere existence of a crowd can empower the individual spectator and delocalize one's decision making. When the sports fan's emotions become charged, the atmosphere becomes volatile; dangerous riots happen, and the actions of the fans can quickly shift from impolite to illegal. Psychologists that have researched violent soccer fans believe, "violence and die-hard loyalty stems from positive emotions like passionate commitment to the group and the desire to belong."[15]

Police in Britain have had success stopping violence and rioting that often erupts during actual sporting events, identifying and removing key instigators at soccer games. However, as Fiona Hill, who served on the National Security Council in the Trump administration, noted, "It's hard when the person who was inciting it

---

[14] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021 at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

[15] Margi Murphy, *Soccer fans have the same mentality as terrorists, study claims*, New York Post, Sept. 27, 2017, at 10:47 a.m., https://nypost.com/2017/09/27/soccer-fans-have-the-same-mentality-as-terrorists-study-claims/; *see* Martha Newsom, *Football, fan violence, and identity fusion*, 54 Int'l Rev. for the Socio. of Sports 431 (2019); *see also* Shirley Wang, *Sports Complex: The Science Behind Fanatic Behavior*, Ass'n for Psych. Sci., May 1, 2006, https://www.psychologicalscience.org/observer/sports-complex-the-science-behind-fanatic-behavior.

happens to be the sitting president of the United States . . . makes it a bit difficult for the police to extricate him."[16]

Under 18 U.S.C. § 3553, the court must consider the circumstances of the offense. As discussed, research recognizes how an individual loses oneself in the crowd and often looks to the group leader for guidance. Groupthink can take over, and violence easily ensues, as happened on January 6, 2021. In the Reginald Denny case of 1992, defendants were acquitted of their most serious charges after a psychiatrist explained how mob mentality took control, causing them to lose their normal control and resort to violence.  Mob mentality was not used by their attorneys to excuse their actions.  Rather, they urged the jury to consider that they were "caught up in the mob frenzy" when assigning their guilt. Similarly, the mob mentality that influenced the crowd on January 6, 2021, does not excuse their actions, but the concept of groupthink and the research discussed should be considered during sentencing.

## C. A sentence below what the government is seeking would avoid unwarranted disparities.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Mr. Brody's conduct and others on January 6. Like many Jan. 6

---

[16] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021 at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

defendants, he was subjected to a torrent of propaganda and lies that the election had been stolen and that democracy was on the brink of collapse. Like hundreds of others, he engaged with police officers. But unlike the vast majority of January 6 protestors, he was barely old enough to legally drink. Unlike many, he did not pre-plan any attack. The following cases demonstrate that home incarceration is fair and reasonable and will avoid unwarranted disparity with other similarly situated cases.

### *United States v. Grayson Sherrill,* 1:21CR282 (TSC)

*United States v. Grayson Sherrill* serves as an apt comparison to Mr. Brody's case because Mr. Sherrill was also one of the youngest defendants sentenced for offenses arising out of January 6. On January 6, Mr. Sherrill was 21 years old, the same age as Mr. Brody. Like Mr. Brody, he was convicted under 18 U.S.C. §111(a). Mr. Sherrill, however, engaged in more culpable conduct than Mr. Brody. Specifically, as one rioter charged an officer, Mr. Sherrill violently swung and struck the officer with a metal pole.

*Footage showing Mr. Sherrill (in the red shirt) swinging a metal pole and striking an officer.*





*Pole striking officer.*

Mr. Sherrill then entered the Capitol building and roamed around for 34 minutes, joining a group of protestors in chanting: "NANCY! NANCY!" Following January 6, Mr. Sherrill deleted videos from his cell phone that he took at the Capitol.[17] Recognizing that Mr. Sherrill was young at the time of the offense, the Honorable Tanya S. Chutkan imposed a sentence of **7 months incarceration**, notwithstanding the government's request for 41 months.

### *United States v. Matthew Council*, **1:21CR207 (TNM)**

Matthew Council's case also serves as a good comparator to this case. Mr. Council, also convicted under 18 U.S.C. § 111(a)(1), rammed into a line of police officers. He later made his way up to the Senate Wing door—despite being pepper sprayed—and struck his fist on the pane of the door for about two minutes.

---

[17] *United States v. Grayson Sherrill*, 21CR282 (TSC), Gov. Sentencing Memo, ECF. No. 124.



*Mr. Council screaming at police after being pepper sprayed*



After being pepper sprayed, Mr. Council entered the building, where he claimed to have encouraged others to steal a laptop. Unlike Mr. Brody, Mr. Council was active on social media after January 6 and was an outspoken advocate for overthrowing the government.[18] The district judge rejected the government's request for a lengthy period of incarceration and imposed **60 months of probation** instead.

---

[18] *United States v. Matthew Council*, 21CR207 (TNM), Gov. Sentencing Memo, ECF. No. 64.

### *United States v. Phillip Young*, 1:21CR617 (DLF)



Defendant Phillip Young was also convicted under 18 U.S.C. § 111(a)(1) for rushing upstairs toward a police line and, along with several other protestors, lifting a barricade off the ground and pushing it toward police officers. When the group was unable to breach the security line the first time, Mr. Young tried again and pushed the barricade toward police officers a second time.

After assaulting officers with the barricade, Mr. Young let the air out of the tires of a government vehicle parked on Capitol grounds. When he was later interviewed by th FBI, Mr. Young said that he laughed at an officer when the officer told him to back down. He claimed his purpose in going to the rally on January 6 was for a last "joy ride."[19] This Court imposed a sentence of **8 months**, notwithstanding the government's request of 30 months.

The above cases show that a sentence of probation with home confinement would be consistent with sentences imposed in 111(a) cases in which the defendant

---

[19] *United States v. Philip S. Young*, 21CR617 (DLF), Gov. Sentencing Memo, ECF. No. 35.

presented with mitigating circumstances, like Mr. Brody, who was extremely young with no prior criminal history.

Meanwhile, the cases the government cites are easily distinguishable. Every single one of them involved more violent and intentioned assault than the conduct of Mr. Brody. Mr. Brody, along with another protester, picked up a barricade separating them and an officer. The officer was holding onto to it and moved backwards. He was not struck with the barricade or injured. The government keeps referring to Mr. Brody as the worst actor out of the small group he came to the Capitol with but fails to take into account the much worse behavior of those around him outside of his four companions. Mr. Brody's companions engaged in virtually the same behavior he did, apart from pushing the barricade, and they all plead to misdemeanors and got probation. Mr. Brody did engage in worse conduct during those brief seconds he pushed a barricade in tandem with another protester, and he's paying for that with a felony conviction. The cases to which the government strains to compare this case show that the requested sentence for Joseph Brody is appropriate because he is less culpable than the defendants they mentioned.

**D. The requested sentence will achieve the goals of sentencing.**

Mr. Brody has been under strict terms of supervision for nearly two years with perfect compliance. He highly valued his ability to vote and his Second Amendment rights and those are now gone forever. He lost his job due to this case and will likely struggle to find employment due to not only the felony conviction, but a simple googling of his name. He has distanced himself from political influences that brought

16

him to the Capitol on January 6, as he outlines in his letter to the Court. *See* Exhibit B. Mr. Brody knows that his actions brought this cascade of consequences onto himself. However, a prison sentence exceeds what is needed to achieve the goals of sentencing.

## **CONCLUSION**

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Brody respectfully requests that the Court impose a sentence of home incarceration followed by probation. This sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
ALEXIS GARDNER
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004